**Case No. 25-51009**

United States Court of Appeals for the Fifth Circuit

**MATTHEW JONES; YSIDRO RENTERIA; and**
**WILLIAM L. JONES CARR,**
***Plaintiffs –Appellants***

***v.***

**AMBER M. KING; CHRIS H. BUSSE; and**
**BRANDON W. JONES,**
***Defendants –Appellees***

Appeal from Case No. 4:22-CV-30
United States District Court for the Western District of Texas
United States District Judge David Counts

# PRINCIPAL BRIEF OF APPELLANTS

John T. Wolf
WOLF & STALLINGS, PLLC
310 W. Wall Street, Ste. 816
Midland, Texas 79701

*Attorneys for William L. Jones Carr*

J. Stephen Hunnicutt
Timothy A. Robinson
THE HUNNICUTT LAW GROUP
17330 Preston Road, Ste. 275-B
Dallas, Texas 75252

*Attorneys for Ysidro Renteria*

Jason Davis
Hayley Ellison
DAVIS & SANTOS, PLLC
719 S. Flores Street
San Antonio, Texas 78204

*Attorneys for Matthew Jones*

# Certificate of Interested Persons

MATTHEW JONES; YSIDRO RENTERIA; and WILLIAM L. JONES CARR,

*Plaintiffs – Appellants*

v. Cause No. 25-51009

AMBER M. KING; CHRIS H. BUSSE; and BRANDON W. JONES,

*Defendants – Appellees*

Pursuant to Federal Rule of Appellate Procedure 26.1 and Fifth Circuit Local Rule 28.2.1, the undersigned counsel of record certifies the following listed persons have an interest in the outcome of this case. These representations are made so the judges of this Court may evaluate possible disqualification or recusal.

*/s/ Hayley Ellison*
Hayley Ellison

**Plaintiff-Appellant Matthew Jones**

**Appellate Counsel:**
Jason Davis
Hayley Ellison
DAVIS & SANTOS, PLLC
719 South Flores Street
San Antonio, Texas 78204

**Trial Counsel:**
Jason Davis
Caroline Newman Small
Jay Hulings
DAVIS & SANTOS, PLLC
719 South Flores Street
San Antonio, Texas 78204

**Plaintiff-Appellant**
**Ysidro Renteria**

**Trial and Appellate Counsel:**
J. Stephen Hunnicutt
Timothy A. Robinson
THE HUNNICUTT LAW GROUP
17330 Preston Road, Suite 275-B
Dallas, Texas 75252

**Trial Counsel:**
Trent Graham
LAW OFFICES OF TRENT GRAHAM, PLLC
110 W. 5th Street
Pecos, Texas 79772

**Plaintiff-Appellant**
**William L. Jones-Carr**

**Trial and Appellate Counsel:**
John T. Wolf
WOLF & STALLINGS, PLLC
310 W. Wall Street, Suite 816
Midland, Texas 79701

**Defendants-Appellees Amber M. King, Chris H. Busse, and Brandon W. Jones**

**Trial and Appellate Counsel:**
William Christian
Daniela Peinado Welsh
Mark A. Stahl
GRAVES DOUGHERTY HEARON & MOODY, P.C.
401 Congress Avenue, Suite 2700
Austin, Texas 78701

## Note Regarding References to Parties

For brevity and clarity, this brief refers to Plaintiffs – Appellants Matthew Jones, Ysidro Renteria, and William L. Jones Carr collectively as Plaintiffs.

Similarly, this brief refers to Defendants – Appellees Amber M. King, Chris H. Busse, and Brandon W. Jones as Defendants.

## Statement Regarding Oral Argument

Plaintiffs respectfully request oral argument. Plaintiffs believe oral argument will substantially aid this Court in resolving important questions concerning the scope of judicial immunity raised in this appeal.

# Table of Contents

Certificate of Interested Persons .......... 2

Note Regarding References to Parties .......... 5

Statement Regarding Oral Argument .......... 5

Table of Contents .......... 6

Table of Authorities .......... 8

Jurisdictional Statement .......... 10

Issues Presented .......... 11

Introduction .......... 12

Statement of the Case .......... 13

I. Plaintiffs are lifelong residents of Loving County. .......... 13

II. Defendants, who are Plaintiffs' personal and political rivals, concocted a voter intimidation scheme during the 2022 election. .......... 16

III. Defendants conspired to have Plaintiffs arrested and jailed under false pretenses. .......... 20

IV. Plaintiffs filed this suit alleging deprivation of their constitutional rights. .......... 27

Summary of the Argument .......... 29

Argument .......... 30

I. This Court accepts the well-pleaded allegations as true and reviews legal questions de novo. .... 30

II. King's orders to arrest and jail Plaintiffs were nonjudicial, regardless of how King labeled those orders after the fact. .... 30

III. Busse and Brandon Jones are not entitled to derivative (quasi-judicial) immunity. .... 38

IV. Busse and Brandon Jones are not entitled to qualified immunity. .... 40

A. There is no qualified immunity for unlawful search and seizure. .... 41

B. There is no qualified immunity for unlawful arrests without due process of law. .... 43

C. There is no qualified immunity for unlawful arrests in retaliation for Plaintiffs' political positions. .... 45

Conclusion .... 46

Certificate of Service .... 50

Certificate of Compliance .... 50

# Table of Authorities

## Cases

*Adams v. McIlhany*,
764 F.2d 294 (5th Cir. 1985) .......... 30

*Club Retro, LLC v. Hilton*,
568 F.3d 181 (5th Cir. 2009) .......... 41

*Ex parte Daniels*,
722 S.W.2d 707 (Tex. Crim. App. 1987) .......... 43, 44

*Ex parte Knable*,
818 S.W.2d 811 (Tex. Crim. App. 1991) .......... 44

*Harper v. Merckle*,
638 F.2d 848 (5th Cir. 1981) .......... 30, 31, 32, 37

*Jones v. Justice of the Peace in the Justice Court, Precinct 1-4, Loving Cnty.*,
Cause No. CV22-08-086 in the County Court of Loving County, Texas .... 26

*Lozman v. City of Riviera Beach*,
585 U.S. 87 (2018) .......... 45

*Malley v. Briggs*,
475 U.S. 335 (1986) .......... 41

*Mays v. Sudderth*,
97 F.3d 107 (5th Cir. 1996) .......... 38, 39, 40

*Medlin v. King*,
705 S.W.3d 267 (Tex. App.—El Paso 2025, pet. denied) .......... 19, 27

*Mendenhall v. Riser*,
213 F.3d 226 (5th Cir. 2000) .......... 42, 43

*Morrison v. Walker*,
704 F. App'x 369 (5th Cir. 2017) .......... 31, 32, 42

*Pearson v. Callahan*,
555 U.S. 223 (2009) ........................................................................ 41

*Serrano v. U.S. Customs & Border Patrol*,
975 F.3d 488 (5th Cir. 2020) ..........................................................41, 46

*Tex. State LULAC v. Elfant*,
52 F.4th 248 (5th Cir. 2022) ........................................................... 18

*Ziglar v. Abbasi*,
582 U.S. 120 (2017) ........................................................................ 41

**Constitutional Provisions**

U.S. CONST. amend. IV ...................................................................... 41

**Statutes**

28 U.S.C. § 1331 ............................................................................. 10

42 U.S.C. § 1983 ............................................................................. 10

52 U.S.C. § 10307(b) ........................................................................ 10

**Other Authorities**

*Contempt*, BLACK'S LAW DICTIONARY (11th ed. 2019) ................................. 36

## Jurisdictional Statement

Plaintiffs filed this suit alleging violations of 42 U.S.C. § 1983 and 52 U.S.C. § 10307(b). *ROA.229* (second amended complaint). The district court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which grants district courts "original jurisdiction of all civil actions arising under the . . . laws . . . of the United States."

The district court partially granted and partially denied Defendants' motion to dismiss the second amended complaint based on judicial and qualified immunity. *ROA.453*. The parties timely cross-appealed. *ROA.480*, *ROA.483*. On August 1, 2025, this Court dismissed Plaintiffs' cross-appeal for lack of jurisdiction. *ROA.486–505; Jones v. King*, 148 F.4th 296 (5th Cir. 2025).

On remand, the district court entered final judgment on October 30, 2025. *ROA.512*. Plaintiffs timely appealed within 30 days. *ROA.513–515*. This Court has jurisdiction over this appeal from a final decision of the district court. *See* 28 U.S.C. § 1291.

# Issues Presented

1. Amber King all but admitted that during her justice of the peace reelection campaign, she orchestrated a plan to arrest and jail her political opponents in order to intimidate voters. King claimed she held Plaintiffs in "direct contempt" for disobeying an unidentified court order. An unlawful arrest order issued during a sham jury qualification proceeding, however, is not a judicial act. Nor does such order become a judicial act merely because the judge, after the fact, labels it "contempt." *Did the district court err by finding King immune for the nonjudicial act of ordering the arrest of her political rivals during the sham jury qualification proceeding?*

2. Peace officers are not immune from liability for executing judicial orders they know are invalid. Chris Busse and Brandon Jones plotted and conspired with Amber King to arrest and detain Plaintiffs pursuant to pre-drafted "direct contempt" orders that all three Defendants knew were unlawful. *Did the district court err by holding Chris Busse and Brandon Jones have derivative (or quasi-judicial) immunity?*

3. Government officials have no qualified immunity if their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. Chris Busse and Brandon Jones knew their conduct violated Plaintiffs' constitutional rights. Because the district court

wrongly concluded Busse and Jones have quasi-judicial immunity, it did not consider whether they are entitled to qualified immunity. *Did the district court err?*

## Introduction

In the middle of the 2022 election season, Defendants (Loving County's former Justice of the Peace Amber King and current Sheriff Chris Busse and Constable Brandon Jones) concocted and carried out a scheme to threaten, intimidate, and punish Plaintiffs for opposing their political agenda.

As part of this scheme, Defendants summoned Plaintiffs to a sham "juror qualification" proceeding where they planned to arrest Plaintiffs for "aggravated perjury." Before Plaintiffs had even set foot in the courthouse, Defendants had prepared "orders for direct contempt" and boasted to friends and relatives that "it might get wild today."

Once Plaintiffs arrived for the sham proceeding, Justice of the Peace King baselessly accused Plaintiffs of lying about being residents of Loving County and therefore eligible to serve on a Loving County jury. With no evidence, no counsel, and no due process whatsoever, King ordered Plaintiffs arrested, handcuffed, and jailed for approximately five hours. After the fact, to evade accountability for her egregious abuse of power, King falsely claimed Plaintiffs had defied an unidentified court order.

In a report and recommendation concluding Defendants are not immune for their misconduct, the United States Magistrate Judge succinctly summarized this case:

> As it has been alleged, Plaintiffs were brought to court for a sting operation from which they had no chance of escaping. The supposedly "direct contempt" orders were pre-drafted and Defendants summonsed Plaintiffs with the plan of arresting them for perjury before they even had the chance to perjure themselves. Most cases will be unlike this one: the claimant will have expected to be part of a legitimate judicial matter, the judge will have merely made a mistake, and/or the contempt finding will be ad hoc. . . .
>
> In a different case on different facts, Defendants may very well be entitled to immunity for Plaintiffs' claims. In this one, however, they are not. [They] went too far[.][1]

The district court concluded all three Defendants are immune for issuing and carrying out the unlawful arrest orders merely because, after the fact, the orders were labeled "orders for direct contempt." In doing so, it erred as a matter of law.

## Statement of the Case

### I. Plaintiffs are lifelong residents of Loving County.

Loving County is located along the Texas-New Mexico border in a remote corner of western Texas. *ROA.232* ¶ *18*. It is Texas' smallest county by

---

[1] *ROA.353*.

population, with less than one hundred residents identified in the 2020 Census. *Id.*

The county has benefitted substantially from the recent boom in oil and gas drilling. *Id.* As oil revenues and property values have increased over the past twenty years, so have property taxes that fund the county budget. *ROA.232–ROA.233 ¶ 18.* In 2008, the county's budget was only about $2 million. *ROA.233 ¶ 18.* By 2020, that total had ballooned to approximately $27 million. *Id.*

The Jones family has been firmly and proudly rooted in Loving County for generations. *ROA.233 ¶ 19.* The Joneses and their family ranching business donate time, sweat, and thousands of dollars annually to Loving County charities and religious organizations. *Id.* The following is a partial Jones family tree:




*See ROA.233 ¶¶ 19, 21, ROA.234 ¶¶ 24–25.*

Plaintiffs Matthew Jones and William Jones Carr are grandsons of long-time former Loving County Sheriff Elgin "Punk" Jones. *ROA.233* ¶¶ *19, 21.* Matthew's father, Skeet Jones, is the Loving County Judge. *ROA.233* ¶ *19.* Matthew has been registered to vote in Loving County since he was eighteen years old. *Id.* He owns property in Loving County, works for the family ranch, and regularly stays there overnight. *Id.*

William Carr's mother, Mozelle Carr, is Judge Skeet Jones' sister and the Loving County Clerk. *ROA.233* ¶ *21.* Like his first cousin Matthew, Carr has been registered to vote in Loving County since he was eighteen years old. *Id.* Carr owns property in Loving County and runs a business in Mentone, the Loving County seat. *Id.* Carr also regularly stays overnight in Loving County. *Id.*

The Renteria family has been established in Loving County for nearly a century as well. *ROA.233* ¶ *20.* Plaintiff Ysidro Renteria was born and raised in Loving County and registered to vote there at age eighteen. *Id.* He has consistently voted in the county for over 40 years. *Id.* Renteria owns property and conducts business in Loving County, and he sleeps several nights per week at his family's Loving County property. *Id.* A dedicated public servant, Renteria has been a Loving County Commissioner since 2011. *Id.*

## II. Defendants, who are Plaintiffs' personal and political rivals, concocted a voter intimidation scheme during the 2022 election.

The scheme Defendants concocted and deployed in this case occurred during—and was designed specifically to influence—the 2022 election. *See ROA.233 ¶ 22, ROA.234 ¶ 23.*

Defendant Brandon Jones is Matthew Jones' and William Carr's first cousin. *ROA.234 ¶ 24*. Brandon's father, Richard Jones, is a brother of Judge Skeet Jones and Mozelle Carr. *Id*. Together with their other siblings, Judge Jones, Richard Jones, and Mozelle Carr co-own the Jones family ranching business. *Id.*

Although Judge Jones initially supported his nephew Brandon's bid to be the Loving County Constable, Brandon later began publicly criticizing and maligning Judge Jones in the media. *Id.* Then, in January 2022, Brandon's wife, Holly Jones (then an employee of the family ranch), announced she was running for Loving County Clerk against Mozelle Carr. *ROA.234 ¶ 25.*

By that time, Brandon and Holly had become closely aligned with newcomers to Loving County—Defendant Amber King and her husband Richard. *Id.* Amber King was elected Loving County Justice of the Peace in 2020. *ROA.235 ¶ 27.* As justice of the peace, King repeatedly clashed with Judge Jones on political and personal issues. *ROA.235 ¶ 30.* King filed multiple,

baseless grievances against Judge Jones for alleged slights, including purportedly raising his voice to King. *Id.* None of those baseless grievances resulted in any disciplinary action against Judge Jones. *Id.*

Ysidro Renteria also found himself in King's crosshairs. Renteria has been a Loving County Commissioner for over a decade. *ROA.233* ¶ *20*. In December 2021, he was asked to serve on the Loving County Appraisal Board, on which Amber King and Defendant Chris Busse (the Loving County Sheriff) also served. *ROA.235* ¶ *27.*

At the March 2022 appraisal board meeting, both King and Busse stated they believed Renteria did not really reside in Loving County and demanded he resign from the board. *Id.* A lifelong Loving County resident, Renteria refused to resign. *Id.* King's husband, Raymond, made a similar motion before the Loving County Commissioners' Court, but the motion failed when no one seconded it. *ROA.235* ¶ *28.*

Amber King and Busse retaliated by causing the Appraisal District to file suit against Renteria. *ROA.235* ¶ *29*. The commissioners later voted to deny funding for the lawsuit and to recall King and Busse from their appointed positions on the appraisal board. *Id*.

King and Busse based their demands for Renteria's resignation on 2021 legislation addressing residency requirements for voters. *ROA.235* ¶ *27*. Shortly

after that legislation (known as SB 1111) was enacted, two non-profit organizations challenged its constitutionality in federal district court. *ROA.246* ¶ *76*; *see also Tex. State LULAC v. Elfant*, 52 F.4th 248 (5th Cir. 2022). During that litigation, the plaintiffs deposed the chief elections officer in Texas, Brian Keith Ingram. *ROA.246* ¶ *77*.

Ingram testified he spoke at length with Busse who, by virtue of his position as sheriff, is also the Loving County Voter Registrar. *ROA.246*–*ROA.247* ¶ *77*. Ingram told Busse a voter who stayed just a few nights per year in Loving County was a resident for voter eligibility. *ROA.247* ¶ *77*. In his own deposition in another matter, Busse admitted this conversation took place as Ingram recounted it and did not dispute Ingram's interpretation of SB 1111:

Q. But do you have any reason to -- to dispute, if it's coming out of Keith Ingram's mouth?

A. No.

Q. Okay. So -- so you have no reason to dispute the concept that even if someone spends just once or twice a year in Loving County, that they could still, depending upon other factors, claim Loving County as a residence for voting?

A. Correct.

*ROA.247* ¶ *78* (emphases added). Notably, after a full trial on the merits, a district court later found each Plaintiff is an eligible Loving County voter even after SB 1111. *See Medlin v. King*, 705 S.W.3d 267 (Tex. App.—El Paso 2025, pet. denied).

Nevertheless, in August 2022, Busse signed and sent to *every* voter in Loving County a letter falsely stating the voter registrar "has received information that your current residence is different from the residence on your information record." *ROA.248* ¶ *82.* Turning voting law on its head, the letter threatened to purge any voter from the rolls who did not respond within thirty days to "prove" their residency. *Id.*

During his deposition, Busse was forced to admit his letters included a significant "lie"—namely, that he had received information challenging voters' residency:

Q. That statement cannot possibly be true for every single resident of Loving County, correct?

A. Correct.

Q. Okay. So when I asked you that this letter had a lie in it, that statement is a lie as it relates to every resident of Loving County, correct?

MR. CHRISTIAN: Objection; form.

A. Correct.

*ROA.249* ¶ *83* (emphases added). Busse conceded a letter containing such lies from the sheriff/voter registrar could impact potential voters:

> Q. And you understand that **if you're a voter and you received this letter with the sheriff's signature on it that says they've received information that your current residence is different, that that could be impactful on voters, correct?**
>
> A. **Right**.

*ROA.249* ¶ *84* (emphases added).

The message to Loving County voters was clear: Defendants would use their power as county officials to punish anyone who dared vote against them. *See* ROA.250. That message became even more clear when Defendants procured Plaintiffs' arrests after the sham jury qualification proceeding.

## III. Defendants conspired to have Plaintiffs arrested and jailed under false pretenses.

Leading up to the May 2022 primaries, Defendants conceived and executed a scheme to further abuse their power as elected officials to punish and intimidate Plaintiffs and directly impact the election. ROA.237 ¶ *41*.

In April 2022, Amber King informed the Loving County Clerk that she wanted to summon prospective jurors. *Id.* It was the first—and only—time King ever requested a venire. *Id.* King also informed the clerk that she wanted to *hand-*

*pick* those who would be called for jury service. *Id.* The clerk provided King a list of many of Loving County's few residents—including Plaintiffs. *Id.* Summonses were issued for their appearance. *ROA.237* ¶¶ *41–42.*

Given Loving County's sparse population, many of its eligible jurors receive summonses each time a jury is needed. *ROA.237*–*ROA.238* ¶ *43*. Although it is not unusual for Plaintiffs to receive jury summonses from the district court, none could recall ever receiving a jury summons for the justice of the peace court. *Id*.

King later admitted that she had already made up her mind to have Plaintiffs arrested by at least the day before they were summoned to appear. *ROA.238* ¶ *44.* King discussed her plan with Loving County Constable Brandon Jones, who told King he wanted to arrest his cousins (Matthew Jones and William Carr) and Renteria for "aggravated perjury." *ROA.238* ¶ *45.* Brandon Jones' wife Holly testified that before the arrests, Brandon told her King planned to arrest Plaintiffs for perjury. *ROA.238* ¶ *46.*

On May 25, 2022, Plaintiffs and the other summoned prospective jurors reported to a meeting room in the Loving County Courthouse annex. *ROA.238* ¶ *47.* Earlier that morning, King texted a friend: "[T]he constable wants to charge them [Plaintiffs] with aggravated perjury. It might get wild today." *ROA.238* ¶ *45.* As William Carr arrived at the courthouse, his uncle Richard (Brandon

Jones' father) approached him, put his face up close to Carr's, and asked whether Carr thought he was "getting what he deserved." *ROA.238* ¶ *47.*

While Brandon Jones and one of Sheriff Busse's deputies watched, King initiated an informal "juror qualification" proceeding. *ROA.239* ¶ *48.* King never called any specific case for trial. *Id.* No parties announced ready for trial. *Id.* There was no court reporter, defendant, or defense counsel, and King never announced the names of jurors summoned for service. *Id.*

King began by addressing the assembled group, telling them anyone who was not a "qualified juror" could leave voluntarily. *ROA.239* ¶ *49.* She then stated any person found not to be a "qualified juror" would be "submitted to the district attorney for aggravated perjury, a third-degree felony," and held in contempt of court. *Id.* No one left. *Id.*

Busse's deputy directed the summoned jurors to stand, raise their right hands, and swear to tell the truth in response to King's questions regarding their "service and qualifications as a juror." *ROA.239* ¶ *50.* Each person did so. *Id.*

King then asked the group a series of yes-or-no questions, including: "You are all citizens of this country and residents of this county?" *ROA.239* ¶ *51.* The summoned jurors responded "yes" in unison. *Id.* King also asked the group: "You are currently eligible to become a qualified voter of this county under the

Constitution and the laws of this state?" *Id.* Again, the jurors answered "yes" in unison. *ROA.239–ROA.240* ¶ *51.*

In response, King stated:

> So it's come to this Court's attention there are several jurors who are not residents of this county. And you were given the opportunity to leave. Since you have not left you will be held in contempt of court, and you will be remanded to the Winkler County Jail for obstruction of the proper administration of justice as well as disrespect to the Court.

*ROA.240* ¶ *52.* King then ordered each Plaintiff arrested. *ROA.240* ¶ *53.* She later confessed that she did not hold a hearing, collect any evidence, or permit Plaintiffs to obtain counsel or defend themselves before ordering their arrests for "contempt." *ROA.241* ¶ *56.*

A video recording of the sham proceeding demonstrates there was no exigency or emergency preceding Plaintiffs' unlawful arrests. *ROA.241* ¶ *57*. Plaintiffs did not disobey any of King's orders. *Id*. Plaintiffs did not disrupt the sham proceeding in any way. *Id*. In fact, none spoke other than to take their oath and answer King's questions "yes" or "no." *Id*. And, as Defendants were well aware, Plaintiffs answered those questions truthfully and accurately. *See* *ROA.248* ¶ *79*.

Brandon Jones and one of Busse's deputies handcuffed Plaintiffs and walked them to waiting vehicles. *ROA.240* ¶ *53*. Sheriff's deputies drove Plaintiffs

to the Winkler County Jail at high-speed, with lights and sirens on. *Id*. Renteria told a deputy his speeding was needlessly endangering all their lives, but the deputy did not respond or slow down. *Id*. At the Winkler County Jail, Plaintiffs were fingerprinted, photographed, and jailed for about five hours. *ROA.240* ¶ *54*.

Shortly after the arrests, Brandon Jones' body camera captured a brief conversation between Defendants. *ROA.245* ¶ *68*. Busse approached King and asked: "What did I miss this morning before I got here?" *Id*. King looked up at Busse with a smile. *Id*. Brandon Jones indicated his body camera was on, then covered it with his hand, obscuring the video and audio recording. *Id*. King also took steps to conceal her actions after the fact, later admitting that she intentionally deleted all information on her Loving County work computer after losing reelection. *ROA.245* ¶ *69*.

It was only through an open records request that Plaintiffs eventually learned King had signed an "Order for Direct Contempt" and a "Modified Order for Direct Contempt" for each Plaintiff. *ROA.241* ¶ *58*. The video of the proceeding shows the contempt orders being presented to King for signature immediately upon Plaintiffs' arrest—demonstrating they were prepared *before* the sham proceeding even began. *Id.*

Each initial order states: "You are hereby remanded to the Winker [*sic*] County Jail for 1 day (24 hrs.) as well as a fine of $100.00." *Id*. Each modified

order states: "You are hereby remanded to the Winker [*sic*] County Jail until 5:00 PM on May 25, 2022, as well as a fine of $100.00." *ROA.242* ¶ *59*. The modified orders were apparently signed after King learned Plaintiffs had been released from the Winkler County Jail at 5:00 p.m. *Id*.

Both the initial and modified orders state the "defendant" "refused to comply with this court's order" and "is hereby charged with Direct Contempt. [*sic*] Per Government Code Chapter 21.002(c)." *ROA.242* ¶ *60*. The orders do not identify the order not complied with or the specific actions forming the basis for "direct" contempt, as required by Texas law. *Id*.

That is because—regardless of what King's after-the-fact orders say—there was no contempt. Instead, as King later admitted under oath, she conducted a *sua sponte* prosecution for perjury in four minutes, acting as prosecutor, judge, and jury:

Q. So you were acting as the prosecutor, the jury and the judge when you sentenced them to imprisonment up

to 5:00 p.m.?

MS. BALOVICH: Objection, form.

Q. Correct?

A. Yes.

*ROA.243* ¶ *63* (emphases added). King also admitted she had only one goal—to intimidate her personal and political rivals:

> Q. Sure. It's an opportunity for you to offer a single explanation other than voter intimidation, why you would order the arrests of people that show up for jury duty, as opposed to saying you can't serve on a jury. Do I have an answer?

> A. (No audible answer)
> Q. Ms. King, do you have an answer?
> A. No.

*ROA.243* ¶ *64* (emphases added).

But King did not stop there. Weeks after the arrests, without authority or due process, King directed the Loving County Clerk to remove Plaintiffs from the list of eligible jurors. *ROA.245–ROA.246* ¶¶ *71–73.*

On October 14, 2022, Plaintiffs filed a petition for writ of mandamus challenging the "contempt" orders. *ROA.245* ¶ *70*. The regional presiding judge appointed a district judge from outside Loving County to consider the petition. *See Jones v. Justice of the Peace in the Justice Court, Precinct 1-4, Loving Cnty.*, Cause No. CV22-08-086 in the County Court of Loving County, Texas. Finding King "clearly abused her discretion and failed to comply with due process," that judge issued a writ of mandamus commanding the new justice of the peace to vacate

the contempt orders. *ROA.245* ¶ *70*. Even Busse ultimately conceded King's unilateral decision to arrest Plaintiffs did not comport with due process. *ROA.244* ¶ *67.*

Amber King, Holly Jones, and Renteria's opponent for county commissioner lost their elections in 2022, and each filed election contests in Texas state court. *ROA.236* ¶ *34.* After a trial on the merits, another appointed district judge found all three Plaintiffs are—as they have been all their lives—Loving County residents. *See Medlin*, 705 S.W.3d 267.

### IV. Plaintiffs filed this suit alleging deprivation of their constitutional rights.

Plaintiffs sued Defendants to hold them accountable for their egregious misconduct as public officials. *See ROA.229* (second amended complaint). Plaintiffs pleaded claims for undue deprivation of liberty, undue burden on the rights to speech and association, violation of due process, conspiracy to deprive them of constitutional rights, and intimidation/coercion regarding voting, as well as conspiracy. *ROA.250*–*ROA.260* ¶¶ *86–145*.

Defendants responded by filing a motion to dismiss based on immunity. *ROA.263*. In a thoroughly reasoned, 77-page report and recommendation, the U.S. Magistrate Judge largely rejected Defendants' immunity arguments, concluding:

> The American system of jurisprudence rests on the assumption that all individuals, whatever their position in government, are subject to federal law: No man or woman in this country is so high that he or she is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government from the highest to the lowest, are creatures of the law, and are bound to obey it.

*ROA.404* (cleaned up). The U.S. Magistrate Judge held King is not entitled to judicial immunity, and Brandon Jones and Busse are not entitled to derivative judicial immunity or qualified immunity. *ROA.404–ROA.405.*

Partially accepting the report and recommendation, the district court held that while King is not immune for conducting the sham juror qualification hearing, she is immune for ordering Plaintiffs arrested under the false cloak of "contempt." *ROA.457–ROA.464.* The district court also held Brandon Jones and Busse are entitled to quasi-judicial immunity for enforcing King's unlawful orders. *ROA.464–ROA.467*. The court partially dismissed Plaintiffs' conspiracy claim as it relates to those claims for which it found Defendants immune. *ROA.468.*

Both sides appealed the district court's order. *ROA.480*, *ROA.483*. This Court reversed the district court's decision to the extent it denied Defendants immunity for the sham juror qualification proceeding and dismissed Plaintiffs' cross-appeal for lack of jurisdiction. *ROA.486–505; Jones*, 148 F.4th 296. On

remand, the district court entered final judgment dismissing Plaintiffs' suit in its entirety. *ROA.512*.

## Summary of the Argument

In the middle of an election, Defendants executed a premeditated scheme to threaten, intimidate, and punish Plaintiffs for opposing their political agenda. Before Plaintiffs had even set foot in the courthouse, Defendants had decided to arrest them for "aggravated perjury" during a sham juror qualification hearing. After the fact, King attempted to evade accountability and further abuse her position of public trust by labeling the arrest orders "orders for direct contempt."

But while holding someone in contempt is ordinarily a judicial act, it is not judicial when the judge uses the contempt power outside of any legitimate judicial process. King summoned Plaintiffs to a nonjudicial proceeding where no case was called and no parties announced ready for trial. She then ordered Plaintiffs arrested—not for disrupting or disrespecting the court, but rather to intimidate them and other Loving County voters. King later admitted that was precisely her goal.

King is not immune from liability for that nonjudicial conduct. Similarly, Busse and Brandon Jones are not derivatively immune for enforcing "direct contempt" orders they knew were pre-drafted to procure Plaintiffs' unlawful

arrests. The district court erred by granting Defendants' motion to dismiss Plaintiffs' § 1983 claims on this basis.

## Argument

### I. This Court accepts the well-pleaded allegations as true and reviews legal questions de novo.

The same standard of review applicable to Defendants' appeal also applies to Plaintiffs' cross-appeal. The Court accepts Plaintiffs' well-pleaded allegations as true and views them in the light most favorable to Plaintiffs. *Terwilliger*, 4 F.4th at 279. The Court reviews legal questions de novo. *Id.*

### II. King's orders to arrest and jail Plaintiffs were nonjudicial, regardless of how King labeled those orders after the fact.

King is not immune from liability for nonjudicial acts. *Mireles*, 502 U.S. at 11. While citing someone for contempt ordinarily is a judicial act, *see Adams v. McIlhany*, 764 F.2d 294, 298 (5th Cir. 1985), this Court has recognized it is not always a judicial act for purposes of judicial immunity. *See Harper v. Merckle*, 638 F.2d 848, 850 (5th Cir. 1981).

In *Harper*, the plaintiff visited a county judge's chambers to deliver a child support check to his ex-wife—a court employee. *Id*. The judge encountered the plaintiff, ordered him to raise his right hand to be sworn, and, when the plaintiff refused and fled, ordered bailiffs to apprehend him. *Id.* at 851–52. The bailiffs retrieved the plaintiff and brought him to the judge in his chambers for a

"'contempt proceeding' of sorts," during which the judge held the plaintiff in contempt and ordered him arrested. *Id.* at 851–53. The plaintiff sued the judge for deprivation of his constitutional rights. *Id.* at 855.

Applying the four-factor test, this Court concluded the judge was not entitled to judicial immunity for the contempt order. *Id.* at 858. Although holding someone in contempt typically would be a "normal judicial function," the Court held a judge is not immune "when it is beyond reasonable dispute that [he] has acted out of personal motivation and has used his judicial office as an offensive weapon to vindicate personal objectives, and it further appears certain that no party has invoked the judicial machinery for any purpose at all." *Id.* at 859.

As the U.S. Magistrate Judge recognized below, this Court "expressly cabined its holding" in *Harper* to the extremely rare facts at issue. *ROA.350* (citing *Harper*, 638 F.2d at 859). In addition, *Harper* may be limited by the Supreme Court's subsequent holding in *Mireles* that judicial immunity is not overcome by mere "allegations of bad faith or malice." *See Morrison v. Walker*, 704 F. App'x 369, 373 (5th Cir. 2017) (citing *Mireles*, 502 U.S. at 11).

Even post-*Mireles*, however, this Court appears to have recognized a judge is not immune where the *Ballard* factors demonstrate "it is beyond reasonable dispute that [she] has acted out of personal motivation and has used h[er] judicial

office as an offensive weapon." *Id.* (citing *Harper*, 638 F.2d at 859). That is precisely what happened here.

King caused Plaintiffs to be summoned to a courthouse annex, purportedly for jury duty, so she could hand-pick a venire. *ROA.237–ROA.238* ¶¶ *41–47*. But no case was called, and no parties announced ready for trial. *ROA.239* ¶ *48*. Even assuming King had a legitimate interest in pre-qualifying many of Loving County's residents for jury service that day, Plaintiffs' well-pleaded allegations demonstrate she decided to have Plaintiffs arrested long before they set foot in the courthouse.

As in *Harper*, this case presents extraordinary facts. King admitted under oath that she planned to arrest Plaintiffs at least a day before the sham juror qualification proceeding took place. *ROA.238* ¶ *44*. Indeed, she pre-drafted "direct contempt" orders before Plaintiffs had even appeared before her. *ROA.241* ¶ *58*. She also could not articulate a single reason for her actions other than "voter intimidation":

> Q. Sure. It's an opportunity for you to offer a single explanation other than voter intimidation, why you would order the arrests of people that show up for jury duty, as opposed to saying you can't serve on a jury. Do I have an answer?

A. (No audible answer)

Q. Ms. King, do you have an answer?

A. No.

*ROA.243*–*ROA.244* ¶ *64* (emphases added).

Put simply, the fix was in well before the sham juror qualification proceeding began. King texted a friend that morning, ominously stating: "It might get wild today." *ROA.238* ¶ *45*. Brandon Jones' wife Holly testified under oath that her husband told her about King's plans beforehand. *ROA.238* ¶ *46*. And before William Carr even entered the courthouse that day, Brandon Jones' father asked him whether he thought he was "getting what he deserved." *ROA.238* ¶ *47*.

Plaintiffs' well-pleaded complaint alleges much more than mere bad faith or malice. As the U.S. Magistrate Judge concluded, the facts alleged in Plaintiffs' complaint detail "a unique and pernicious environment only in which illegitimate political attacks and the abuse of the judiciary and its offices could occur." *ROA.352*. Tellingly, "Defendants do not even attempt to counter that the proceeding was legitimate, motivated by a genuine need to select a venire, or otherwise." *ROA.352–53*.

The district court, however, rejected *Harper* entirely and instead analogized this case to *Malina v. Gonzales*. In that case, a Louisiana state court

judge placed a flashing red light on his vehicle's dash and pulled over a driver who had honked at him. *Malina*, 994 F.2d at 1123. The judge demanded the driver show him identification, but the driver refused and drove away. *Id.* Three hours later, a police officer appeared at the driver's home and told him the judge "wanted to see him in his court at 9:30 a.m. the next day." *Id.*

The next morning, the driver appeared in the judge's courtroom, and the judge announced he was charging the driver with traffic violations to convince him to pull over the next time he was instructed to do so. *Id.* The driver "responded that he did not feel comfortable stopping for unmarked vehicles with flashing lights because anyone can buy such a light." *Id.* In response, the judge cited the driver with contempt and sentenced him to five hours in jail. *Id.*

This Court held the judge was not immune for the traffic stop, the "highly irregular" summons, or charging the driver with traffic violations, which were all nonjudicial acts. *Id*. at 1124–25. Nevertheless, applying the *Ballard* factors, the Court concluded the contempt order was judicial because it was made in the judge's courtroom and arose directly from the driver's visit to the judge in his official capacity. *Id.*

The district court found this case to be like *Malina* because it "involves a judge, who, because of an alleged personal animus, issued a highly irregular summons, which ultimately concluded with Plaintiffs being held in contempt

and sentenced to five hours in jail." *ROA.463*. But *Malina* is unlike this case in important ways.

First, in *Malina*, the judge held the driver in contempt while conducting a hearing, albeit an improperly noticed hearing at which the driver faced unlawful charges. *Id.* at 1124. Although the Court concluded the judge lacked authority to bring those charges, there did not appear to be any dispute that holding a hearing on pending charges was itself a judicial act.

Here, in contrast, King was not performing a judicial act at the time she had Plaintiffs arrested. No case was being heard, and Plaintiffs had not been brought before King on any charges. *ROA.239* ¶ *48*. Instead, King was purporting to perform a juror qualification proceeding, which is itself a nonjudicial act. *See Ex parte Virginia*, 100 U.S. at 340.

Second, the *Malina* opinion does not indicate there was any allegation or evidence that the judge decided to have the driver arrested and jailed before the hearing even began. Rather, the judge told the driver he must appear before the duty-judge concerning the traffic violations charges at a later date. *Malina*, 994 F.2d at 1123. It was only after the driver said he did not feel comfortable stopping for unmarked cars with police lights that the judge cited him with contempt. *Id.* The judge apparently thought the driver's statement was

"[c]onduct that defies the authority or dignity of a court[.]" *See Contempt*, BLACK'S LAW DICTIONARY (11th ed. 2019).

King, however, did not order Plaintiffs arrested in response to any conduct defying the authority or dignity of the court. King admitted she decided to arrest and jail Plaintiffs *before* they even showed up at the courthouse. *ROA.238* ¶ *44*. And while King's "contempt" orders state Plaintiffs "refused to comply with this court's order," they do not identify any order purportedly not complied with. *ROA.242* ¶ *60.* There is no dispute King and her co-conspirators agreed to arrest Plaintiffs for "aggravated perjury" before Plaintiffs even had an opportunity to perjure themselves. *ROA.238* ¶¶ *44–46*.

A judge is (and should be) immune even for erroneous decisions made in her judicial capacity. *See Forrester*, 484 U.S. at 226–27. That is because "[i]f judges were personally liable for erroneous decisions, the resulting avalanche of suits, most of them frivolous but vexatious, would provide powerful incentives for judges to avoid rendering decisions likely to provoke such suits." *Id.*

But unlike the driver in *Malina*, Plaintiffs do not merely allege bad faith or malice motivated an otherwise judicial act. Plaintiffs allege King, while conducting a nonjudicial sham proceeding, committed a nonjudicial act and only later labeled that illegal, nonjudicial act "contempt" to evade accountability. If that were enough to shield a judge from liability, judges would

be above the law. As the Supreme Court explained, immunity is "strong medicine" justified only to protect judges in performing their *official* duties. *Forrester*, 484 U.S. at 227. King's ordering Plaintiffs arrested during a nonjudicial, sham juror qualification proceeding, is no different than had she ordered them arrested for "contempt" while walking past her on the street.

Just as there should be no disincentive for judges to make decisions as part of the normal judicial process, the cloak of immunity should not provide a powerful incentive for judges to use their positions to threaten and punish their personal and political rivals. King was entrusted by Loving County to serve as its justice of the peace. She, together with the other Defendants, abused that trust to avenge a personal political vendetta.

This Court's analysis in *Harper* was "tailored to . . . the rarest of factual settings." 638 F.2d at 859. This case presents equally rare and egregious facts. King is not judicially immune for nonjudicial acts, regardless of how she labels those acts after the fact. Accordingly, the district court erred in concluding King is judicially immune for ordering Plaintiffs arrested and jailed under the false cloak of "contempt."

### III. Busse and Brandon Jones are not entitled to derivative (quasi-judicial) immunity.

A state officer who complies with a facially valid judicial order is immune from a suit for damages. *Mays v. Sudderth*, 97 F.3d 107, 113 (5th Cir. 1996). "As the officer's immunity derives from that of the issuing judge, the order must be one for which the judge is absolutely immune from suit." *Id.* at 114. Because King is not immune, neither are Busse and Brandon Jones immune for executing King's unlawful orders.

But even if King were immune, Busse and Jones are still liable because they knew they were executing facially invalid orders. *See id.* Recognizing the paucity of authority addressing what are "facially valid" orders for immunity purposes, the U.S. Magistrate Judge summarized cases from around the country. *ROA.363*–*ROA.364 & n.176*. Those authorities demonstrate that where a law enforcement officer knows or is aware that a judicial order is legally invalid, he cannot claim quasi-judicial immunity for enforcing it. *ROA.363*–*ROA.364* & n.176.

The district court, however, rejected this analysis and instead extrapolated a three-part test from the Supreme Court's 1871 decision in *Erskine v. Hohnbach*, 81 U.S. 613 (1871). *ROA.465*. Under the district court's test, "[a] valid order . . .

must be (1) regular on its face, (2) with no departure from the law, and (3) not possess a defect of jurisdiction over the person or property affected." *Id.*

Although this Court cited *Erskine* in *Mays*, it neither recognized nor applied that test. This Court's analysis in *Mays* was more nuanced. The Court expressly cautioned: "We do not hold that a state officer may never be held liable for the unquestioning execution of a judicial directive. There are limits to how unlawful an order can be and still immunize the officer executing it." *Mays*, 97 F.3d at 114 (cleaned up). For instance, a state official would not be immune for blindly executing an order issued in the complete absence of all jurisdiction. *Id.*

Busse and Brandon Jones did not merely enforce orders that would otherwise appear facially valid to neutral, disinterested, reasonable law enforcement officers. Everyone present at the sham juror qualification proceeding knew there was no "direct contempt."

Busse and Jones knew they had premeditated and conspired with King to procure those very orders under false pretenses. King and Jones discussed their plan before the sham juror qualification proceeding, and Jones told King he wanted to arrest Plaintiffs for "aggravated perjury." *ROA.238* ¶ *45*. Jones' wife Holly confirmed her husband told her the Plaintiffs would be arrested before the alleged "direct contempt" had even occurred. *ROA.238* ¶ *46*. And the orders of

direct contempt were evidently prepared before the hearing even began. *ROA.241 ¶ 58*.

This Court has acknowledged public policy supports quasi-judicial immunity in cases in which officers are merely executing facially valid judicial orders: "[A]n official charged with executing a facially valid court order has no choice but to do so. Government officials should not be required to make the Hobson's choice between disobeying the court order or being haled into court to answer for damages." *Mays*, 97 F.3d at 113 (cleaned up).

But here, neither Busse nor Jones faced any Hobson's choice, since both knew from inception that the "contempt" orders were simply cover for otherwise unlawful conduct. The only choice Busse and Jones faced was whether to uphold the law or join King's unlawful conspiracy. They chose the latter.

Plaintiffs have pleaded facts that, taken as true, show Busse and Jones knew the orders were invalid and executed them anyway. The district court therefore erred by holding Busse and Jones have derivative judicial immunity.

## IV. Busse and Brandon Jones are not entitled to qualified immunity.

Because it held Busse and Jones are entitled to quasi-judicial immunity, the district court did not address whether they are also entitled to qualified immunity. Because they are not, this Court may reverse and instruct the district court to deny Defendants' motion to dismiss in its entirety.

The doctrine of qualified immunity does not shield government officials from liability for civil damages if their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Serrano v. U.S. Customs & Border Patrol*, 975 F.3d 488, 503 (5th Cir. 2020) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). In other words, qualified immunity does not protect "'the plainly incompetent or those who knowingly violate the law.'" *Ziglar v. Abbasi*, 582 U.S. 120, 152 (2017) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Busse and Jones are not entitled to qualified immunity for procuring Plaintiffs' arrest and detention because they knowingly violated the law and conspired with King to do it. *See id.* In the district court, Defendants did not dispute that Plaintiffs' arrests and detention were unlawful. Rather, they argued only that they are immune from liability because they merely followed King's orders. That argument is without merit.

### A. There is no qualified immunity for unlawful search and seizure.

It is well established that an arrest without probable cause violates the Fourth Amendment. *See* U.S. CONST. amend. IV; *Club Retro, LLC v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009). Accordingly, law enforcement officials are not immune from a claim of unlawful search and seizure if they knew the arrest was

without probable cause. *See Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000). While probable cause for arrest may exist when law enforcement officers *merely* execute a judge's order, *see Morrison*, 704 F. App'x at 371–75, that is not what happened here. Busse and Brandon Jones conspired with King to arrest Plaintiffs under pretenses all three Defendants knew were false.

King's "direct contempt" orders charge Defendants with "refus[ing] to comply with this court's order." *ROA.242 ¶ 60*. But King neither identified any order not complied with nor any other basis for direct contempt.

Even assuming the basis for this order was Plaintiffs' affirmation that they are Loving County residents, Busse and Jones knew Plaintiffs were telling the truth. Brandon Jones knows his own cousins are lifelong residents of Loving County. *ROA.248 ¶ 79*. In addition, Texas' chief elections official told Busse that anyone who owns property and occasionally stays overnight in Loving County (like Plaintiffs) may be lawfully registered to vote there. *ROA.246–ROA.248 ¶¶ 77–79*. An appointed district judge later confirmed the obvious—Plaintiffs are residents of and eligible voters in Loving County. *See Medlin v. King*, No. 08-24-00001-CV pending in the Eighth Court of Appeals of Texas at El Paso.

Further, Plaintiffs do not allege Busse is liable solely for the acts of a subordinate deputy. Rather, the sheriff's deputy who handcuffed Plaintiffs stated that either Busse or his principal deputy told him ahead of time that Plaintiffs

were going to be arrested. *ROA.244* ¶ *67.* Busse was present and witnessed the arrests as they occurred and spoke to King while Plaintiffs were escorted from the courthouse annex. *ROA.244*–*ROA.245* ¶¶ *67–68.* But Busse stood by and did nothing to intervene. *ROA.244* ¶ *67.*

A state district court later found King "clearly abused her discretion and failed to comply with due process by issuing" the contempt orders. *ROA.245* ¶ *70*. Busse and Jones knew there was no probable cause to arrest Plaintiffs for purportedly "lying" about their residence and had made up their minds to do so beforehand. Therefore, Busse and Jones are not immune for executing King's orders. *See Mendenhall*, 213 F.3d at 230 ("[A] qualified immunity defense cannot succeed where it is obvious that a reasonably competent officer would find no probable cause.").

### B. There is no qualified immunity for unlawful arrests without due process of law.

Whether a plaintiff's due process rights have been violated by a judicial contempt order depends on the type of contempt at issue. *See Ex parte Daniels*, 722 S.W.2d 707, 709 (Tex. Crim. App. 1987). Direct contempt is committed or occurs in the presence of the court. *Id.* Constructive contempt, on the other hand, involves actions outside the presence of the court and therefore requires testimony or other evidence to establish its existence. *Id.* While a direct

contemnor has no right to a hearing or counsel, a person accused of constructive contempt is entitled to notice and a hearing and cannot be legally confined without first having a reasonable opportunity to obtain counsel. *Id.*

The U.S. Magistrate Judge correctly concluded that, despite King's after-the-fact signing of "direct contempt" orders, the contempt alleged could not have been direct. *ROA.353*. Defendants decided to arrest Plaintiffs for "aggravated perjury" before the sham juror qualification proceeding took place and told others they had done so. *Id.* Even the "direct contempt" orders were apparently pre-drafted. *ROA.241* ¶ *58.* Necessarily, then, any alleged perjury would have been committed before the proceeding, and testimony or evidence would be necessary to prove it. *See Ex parte Daniels*, 722 S.W.2d at 709 (constructive contempt requires evidence). But Plaintiffs were afforded no due process before they were handcuffed, arrested, and jailed.

There was no conduct supporting a finding of direct contempt, but even if there were, such a finding "does not automatically justify summary punishment of the contemnor." *Ex parte Knable*, 818 S.W.2d 811, 812 (Tex. Crim. App. 1991). The rationale for allowing summary punishment for direct contempt is "[t]o preserve order in the courtroom for the proper conduct of business," and to "vindicat[e] the court's dignity and authority" where offended. *Ex parte Daniels*, 722 S.W.2d at 709. As the U.S. Magistrate Judge concluded, "[i]t is

hardly conceivable how even obvious dishonesty in suggesting that one is a resident of Loving County when he is not would strike so severe to court decorum that it would warrant immediate summary punishment." *ROA.378*.

A district judge appointed from outside Loving County later concluded King clearly abused her discretion and failed to comply with due process by issuing the "direct contempt" orders. *ROA.245* ¶ *70*. Because Busse and Jones knew those orders were invalid, they are not entitled to qualified immunity for executing them without due process.

### C. There is no qualified immunity for unlawful arrests in retaliation for Plaintiffs' political positions.

There was no probable cause for Plaintiffs' unlawful arrests. But even if there were, Plaintiffs need not allege or prove the absence of probable cause to adequately allege a claim for violation of their First Amendment rights. *See Lozman v. City of Riviera Beach*, 585 U.S. 87, 101 (2018) (holding citizen "need not prove the absence of probable cause to maintain a claim of retaliatory arrest"). Rather, Plaintiffs need only allege the arrests were retaliation for Plaintiffs' exercise of their First Amendment rights of speech and association. *See id.*

Plaintiffs have done so. Plaintiffs allege Defendants conspired to engage in a coordinated effort "to prevent, coerce, and/or intimidate Plaintiffs from exercising their right to speech regarding matters of public concern in Loving

County, including opposition to the elections and political positions of Defendants." *See ROA.239*. In addition, Plaintiffs allege Defendants conspired to illegally arrest and detain them as retaliation for their association with "persons opposed to Defendants' elections and political positions." *ROA.252–ROA.253 ¶¶ 99–115*. Defendants' actions occurred in the middle of an election, and King later admitted she had no goal other than "voter intimidation." *ROA.243–ROA.244 ¶ 64*.

Because the right to be free from retaliatory arrest, with or without probable cause, is well established, the U.S. Magistrate Judge correctly concluded Busse and Jones have no qualified immunity for their intrusion upon that right. *See Serrano*, 975 F.3d at 503 (holding officials have qualified immunity only to the extent "their conduct does not violate clearly established statutory or constitutional rights").

## Conclusion

King summoned her personal and political rivals to a sham juror qualification precisely so she could order them publicly arrested and humiliated. Her goal was simple—send an intimidating and ominous threat to every Loving County voter who dared to oppose her.

After ordering her rivals arrested and jailed, King then attempted to evade accountability by labeling the arrest orders "orders for direct contempt." While

citing someone for contempt ordinarily is a judicial act, it is not judicial when the judge weaponizes the judicial machinery, outside of any regular judicial process, for no legitimate purpose. Because that is what King did here, she is not judicially immune for ordering Plaintiffs' arrests under the false label of "contempt." For the same reason, Busse and Brandon Jones are not derivatively immune for conspiring to execute orders they knew were unlawful.

In addition, Busse and Brandon Jones are not entitled to qualified immunity. They were not dispassionate officers executing orders. Instead, Busse and Jones knowingly conspired with King to deprive Plaintiffs of their constitutional rights and intimidate Plaintiffs and other Loving County voters. There can be no doubt Busse and Jones knew the contempt orders were unlawful at the time they executed them.

The district court therefore erred by granting Defendants' motion to dismiss Plaintiffs' § 1983 and conspiracy claims based on the orders for Plaintiffs' arrests. This Court should reverse that decision and remand to the district court with instructions to deny Defendants' motion to dismiss on this basis and for further proceedings.

Dated: April 16, 2026.

Respectfully submitted,

**DAVIS & SANTOS, PLLC**

By: */s/ Hayley Ellison*
Jason Davis
Texas Bar No. 00793592
E-mail: *jdavis@dslawpc.com*
Hayley Ellison
Texas Bar No. 24074175
E-mail: *hellison@dslawpc.com*
719 S. Flores Street
San Antonio, Texas 78204
Telephone: (210) 853-5882
Facsimile: (210) 200-8395

***Counsel for Plaintiff – Appellant Matthew Jones***

and

**THE HUNNICUTT LAW GROUP**

By: */s/ J. Stephen Hunnicutt*
J. Stephen Hunnicutt
State Bar No. 10279510
E-mail: *steve@hunnicuttlaw.com*
Timothy A. Robinson
State Bar No. 24069040
E-mail: *tim@hunnicuttlaw.com*
17330 Preston Road, Suite 275-B
Dallas, Texas 75252
Tel.: (214) 361-6740

Fax: (214) 691-5099

***Counsel for Plaintiff – Appellant Ysidro Renteria***

and

**WOLF STALLINGS & MAYO**

By: */s/ John T. Wolf*
John T. Wolf
State Bar No. 24098629
E-mail: *john@wolfstallings.com*
310 W. Wall Street, Suite 816
Midland, Texas 79701
Tel.: (432) 237-3530

***Counsel for Plaintiff – Appellant William L. Jones Carr***

## Certificate of Service

I certify that on April 16, 2026, a true and correct copy of the foregoing document was delivered by ECF filing to the Clerk of the Court and to all counsel of record, all of whom are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/Hayley Ellison*
Hayley Ellison

## Certificate of Compliance

This document complies with the word limit of Federal Rule of Appellate Procedure 28.1(e)(2)(B)(i) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains __7,339__ words.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in size 14 Calisto MT font.

*/s/ Hayley Ellison*
Hayley Ellison